## Case No. 12,242.

### The ST. MARY.

[2 Blatchf. 329.] [1]

Circuit Court, S. D. New York. Oct. 7, 1851.

MARITIME LIENS—UNDER STATE STATUTE—BILL OF SALE—DISBURSEMENTS—PRIORITIES.

1. It is sufficient to give a lien, under the statute of New York (2 Rev. St., p. 493, § 1), against a domestic vessel, for money advanced for supplies furnished to her in her home port, that the items of account for such advances amount in the aggregate to $50. It is not necessary that each item should amount to $50.

2. Where S., having a claim against F. for $5,000, as the balance of $12,000, purchase-money of a vessel, took a bill of sale of the vessel from F., with power to sell her and pay himself said balance, and at that time W. had a claim against F., for disbursements for stores and supplies for the vessel and for a commission for services in fitting the vessel for sea and procuring freight and passengers for her, of which claim S. had knowledge at the time, held, on a libel in rem filed by W. to recover his claim, that S. was entitled to payment of his claim for the balance of the purchase-money, before W. could receive any part of his claim, but that W.'s claim had priority over a claim by S. for disbursements made by him, after taking said bill of sale, in fitting the vessel for sea.

3. The terms of the bill of sale, considered.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, filed on the 23d of November, 1849, in the district court, by Albert A. Warner against the ship St. Mary, an American vessel. The facts stated in the libel were these: Warner, as agent for one French, the owner of the vessel, was engaged at New York from the 15th of September, 1849, to the 22d of November, 1849, in procuring equipments and supplies and freight and passengers for the vessel, for a voyage from New York to San Francisco, and, during that time, paid and advanced to and for French, and at his request, large sums of money for stores, supplies, provisions and otherwise. After crediting various sums received by Warner for freight and passage-money, there remained due to him, on the 21st of November, 1849, for moneys so advanced, including his charge for commissions, a balance of $2,501.30. The charge for commissions was $1,250, being 5 per cent. on $25,-

000. Several of the items of account claimed were less than $50 each. On the 21st of November, 1849, the vessel being ready for sea, Warner presented his account to French, who examined it and acknowledged its contents, and, on the same day, gave Warner a mortgage on the vessel to secure the $2,501.30, with interest. The firm of Simes & Huffer, as claimants, put in an answer, which set up these facts: French purchased the vessel from them on the 15th of September, 1849, at New York, for $12,000. On the same day French executed to them a paper, reciting the sale for $12,000, and setting forth that $3,000 of it was to be paid on the 17th of that month, $4,000 in thirty days from date, and the balance within sixty days from date and before the vessel should leave New York; that no transfer of the vessel was to be made until the whole amount should be paid; that, in case of default in any of the payments, the vessel was to be sold at public sale, on account of French and at his expense; that Simes & Huffer were to be at liberty to purchase at the sale; and that French was to pay the deficiency, if any. Warner knew the terms of French's purchase at the time it was made, or shortly after. French took possession of the vessel, and paid the $7,000, as agreed. On the 26th of October, 1849, $5,000 of the purchase-money being unpaid, French made to Simes & Huffer a proposal, in writing, that they should "take possession of the ship, and charge of the management of her business for loading and getting to sea," "with the understanding that whenever" they should be "in receipt of a sufficient amount of money to cover the balance due for purchase-money, and any liabilities" they might "be under, growing out of this transaction and connection," French should "be entitled to a bill of sale of the ship, in order that" he might "sell or hypothecate her to another party, under the condition that the proceeds of such sale or hypothecation" should "pass into" their "hands for the disbursement of the ship." The proposal concluded as follows: "I further agree that, before the ship goes to sea, you shall be placed in funds sufficient to cover all the liabilities of the ship and outfits. If, therefore, you accept this proposition, you will please cause the ship to be loaded and prepared for sea with all due diligence and despatch, and, in compensation for your services, I agree to allow you two and one-half per cent. commission on the amount of her freight and passage-money, warranting the same to amount to twenty-five thousand dollars." On the same day, Simes & Huffer and Warner signed a memorandum indorsed on said proposal, in these words: "We accept the within proposition of Mr. French, and it is understood that Mr. A. A. Warner is to be associated with us so far as the passenger part of the business is concerned. All bills of lading are to be signed at our office, and all bills against the ship to pass through the hands of Simes & Huffer."

---

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

Simes & Huffer forthwith took possession of the ship under the agreement, with Warner's knowledge, and rendered the services and made the disbursements necessary to fit her for sea. They claimed a lien on the vessel for a balance of $7,042.37 due them for their disbursements for her, over and above the $5,000 balance of purchase-money and interest. On the 26th of October, 1849, Warner gave to Simes & Huffer a written paper, in these words: "Having this day entered into an agreement with Messrs. Simes & Huffer, to conduct the passenger part of the ship St. Mary, now advertised for California, it is hereby agreed by me, that the amount of funds received by me from passengers is to be applied solely to the account of the ship St. Mary, or subject to the order of Messrs. Simes & Huffer for the use of said ship." On the 22d of November, 1849, another agreement was made between French and Simes & Huffer, by which, after a recital that French still owed them, on his purchase, $5,000, and interest from November 15th, 1849, and that they had paid bills in relation to the contemplated voyage to San Francisco, and other bills had been incurred and were outstanding against the ship or on account of the voyage, French assigned and transferred to them all his right, title and interest in the ship, "her tackle, apparel and furniture, and in her freight and passage-money and all sums of money due or to become due, for freight or passage-money or otherwise," to the ship, or to French on her account or on account of the voyage, and authorized them to take the entire control and management of her and of the voyage, and to collect and compromise any claims due to French on account thereof, and to settle, and, if they saw fit, to compromise any claims against French or the ship on account thereof, and to sell the ship on such terms and at such time as they might think best, and, if they thought best, to provide a voyage for her return to the United States or elsewhere. The agreement further provided that, from the earnings of the ship, and her proceeds, if sold, Simes & Huffer were to pay themselves the balance due on her and all disbursements made by them on her account or connected therewith, and twenty per cent. commission on the receipts and disbursements, as their compensation; that, if there should be a surplus when the affairs were closed, Simes & Huffer should pay it to French; and that Simes & Huffer should appoint an agent in San Francisco, with authority, in case French should there pay the full amount due them or for which they were liable, including commissions, to transfer and give a bill of sale of the ship to French, provided no previous transfer should have been made. The answer set up, that the court had no jurisdiction to enforce Warner's claim against the vessel; that Warner had no right to arrest the ship or interfere with her voyage; that the greater part if not the whole of Warner's account, as set

forth in the libel, was not a lien on the vessel, either by the laws of New York or under the admiralty law; and that Warner's rights were subordinate to those of the claimants. The other facts necessary to an understanding of the case are stated in the opinion of the court. After a decree by the district court in favor of the libellant [case unreported], the claimants appealed to this court.

Edward H. Owen, for libellant.
George C. Goddard, for claimants.

NELSON, Circuit Justice. The merits in this case are with the libellant, and I think that the decree below is maintainable upon principles of law. I lay out of view the mortgage given upon the vessel, and put the decision upon the original indebtedness.

The per centage which French agreed to allow the libellant for fitting out the vessel and procuring freight and passengers for her voyage to San Francisco, as compensation for the service and responsibility, partakes of the same nature and character as the disbursements made in the course of the service, in furnishing stores, &c., in fitting the vessel out. The reasonableness of the amount is not in question, as French determined that for himself, and it was a matter in which he alone was concerned at the time. For aught that appears, the compensation was the customary rate allowed in fitting up and freighting these California passenger vessels.

As respects other parts of the claim, which, it is conceded, are properly chargeable against the ship, I do not agree with the counsel that each claim must exceed the amount of fifty dollars, in order to bring the lien within the state statute. 2 Rev. St. p. 493, § 1. It is sufficient if the amount in the aggregate reaches that sum.

I agree that Simes & Huffer had a prior lien on the vessel for the five thousand dollars and interest, the balance of the purchase-money, at the time they resumed the possession of her, and that they were entitled to its payment out of her proceeds, before any distribution to the libellant. But it must be remembered that, when the vessel passed into their hands, under the arrangement of the 22d of November, French had an interest in her to the amount of $7,000, he having paid that portion of the purchase-money. This interest passed into their hands on the re-transfer, and was fairly subject to the charges of the libellant. She was ample security for both demands. Beyond this balance of the purchase-money, Simes & Huffer had no prior lien on the vessel over the libellant; and it is apparent, from the transactions between all the parties, that they were fully aware of his claim at the time of the arrangement of the 22d of November. The libellant had been engaged in equipping the ship and procuring freight and passengers, from the 17th of

September down to the 26th of October, when Simes & Huffer became jointly concerned with him in the business, and I must hold them chargeable with a knowledge of the service he had already performed in this respect, and of the disbursements made and accounts outstanding at the time they became concerned with him. With a few trifling exceptions, his whole account had then already accrued against the vessel. It is true, some evidence was given tending to show that an account, the balance of which amounted to some $386, had been rendered by the libellant at this time; but it is altogether too indefinite and uncertain to be relied on for this purpose. The writings that were made at the time make no mention of it, or of the amount of the indebtedness to the libellant. That the amount now claimed existed at the time, is too well established to be doubted.

What strengthens very much the equity and justice of the claim of the libellant, under the circumstances, is the nature and character of the arrangement of the 22d of November, between Simes & Huffer and French. It not only assigns all the interest of the latter in the vessel, freight and passenger money, and authorizes them to sell and dispose of her, and requires them, after paying themselves, to pay the surplus, if any, over to French, but provides, also, that, if the vessel is not sold, they shall appoint an agent at San Francisco, with authority, in case French shall pay the full amount due them or for which they may be liable, to make a bill of sale of the vessel to French. By this arrangement, the claims of the libellant are not only entirely disregarded, but the interest of French in the vessel, over and beyond the lien of Simes & Huffer for the balance of the purchase-money, is placed out of the libellant's reach. We have seen that he had the next lien on the vessel, and was entitled to have it enforced before any other of the claims of Simes & Huffer. Besides, it is by no means certain that they did not bind themselves to French, by the arrangement of the 22d of November, to pay the claim of the libellant. Among other stipulations, they agree "to settle, and, if they see fit, to compromise, any claims against the said French or said ship, on account thereof."

It seems to me that the libellant had a valid lien upon the interest of French in the vessel, when it passed into the hands of the claimants on the 22d of November, and that it was sufficient, over and beyond their prior lien for the balance of the purchase-money, to satisfy his claim. They had sold her to French, on the 15th of September previous, for $12,000, and, on the 23d of November, she appears to have been insured at the value of $16,000.

The libellant had no interest in the voyage. He had been employed to fit up the ship and procure freight and passengers, and was concerned only in this service, and in securing his compensation for the same and for his disbursements; and I do not see that he was bound to forego these claims rather than break up the voyage. This was a question for those interested or who had become interested in getting the vessel to sea and in making the voyage—not for the libellant. I see nothing in the case to restrain him from enforcing his rights, even at the expense of breaking up the voyage. French or those who had taken his place were bound to look to this, and to relieve the vessel from the charge.

In every view I have been able to take of the case, I think that the decree below was right and should be affirmed.